**GENERAL MILLS, INC., Appellant,**

v.

**Caskey LIVINGSTON et al., Appellees.**

**No. 3512.**

Court of Civil Appeals of Texas.

Eastland.

Feb. 19, 1960.

Rehearing Dismissed March 18, 1960.

Runge, Marschall & Runge, San Angelo, for appellant.

H. O. Woodward, Coleman, Glenn Lewis, San Angelo, for appellees.

PER CURIAM.

Caskey Livingston and R. H. Whitaker, doing business as Wilson Grain & Elevator Company at Coleman, Texas, filed suit in Coleman County on an account against General Mills, Inc., C. H. Brooks and Feather Haven Farms, Inc., for $28,553.79.

General Mills filed a plea of privilege and the plaintiffs filed a controverting affidavit under that part of subdivision 27 of Article 1995, Vernon's Ann.Civ.St., which provides that suits against foreign corporations may be brought in the county where a part of the cause of action accrued. In a non-jury trial, the plea of privilege was overruled and General Mills has appealed, contending the court erred in overruling its plea of privilege (1) because the evidence shows no cause of action against General Mills, (2) because there was no evidence that the alleged agent purported to act for General Mills, or that he was acting within the scope of his authority, or that employees of General Mills ratified the asserted contract and (3) because the court's express and implied findings of agency and ratification are against the great weight and preponderance of the evidence.

In 1956, Brooks came to plaintiffs' store and told Livingston about a turkey raising project and asked Livingston if he wanted to furnish the grain. When Livingston was asked "Tell us, now, what what said between Brooks and you in that conversation relative to the proposed operation?" he answered "Well, Charley came into the store there, and, well, I don't know how to state it. He told me he had some pretty good news, and he told me he had an opportunity to grow out 50,000 turkeys; and the contract, a firm contract he had with Fort Worth Poultry & Egg; Fort Worth Poultry & Egg offered him a set price for the birds that he would produce, grow out, under this contract, and he asked me if I would be interested in providing the grain on that operation. * * * I told him I was interested. * * * and I told him that I would provide the grain, and he told me approximately how much he would need, and he said he would need, I don't know, 300,000 pounds, I believe. * * * Yes, sir. He said it would be used just as we had been doing in the past on regular finance program." In November, 1956, Livingston began selling Brooks grain under this arrangement and continued until

he was informed by General Mills by letter that "We are advising you that we cannot accept further grain charges on our turkey finance program with Mr. Brooks until such time as his account is in line on our ledgers." Livingston testified: that he delivered grain to Brooks only when Brooks or his employee called for it and that the cost of hauling was charged to Brooks; that the unpaid balance for the grain which he delivered to Brooks under this arrangement as of May 17, 1957, was $28,553.79; that Brooks admitted he was responsible for the full amount of the feed bill; that in April, 1957, before he received the letter from General Mills in May, 1957, advising him that General Mills could not accept further grain charges, he had a conference in Ballinger with Brooks and Brooks executed and delivered to him three $10,000 notes which was approximately the total amount owed by Brooks to the plaintiffs for feed at the time; that "Those notes were made up purely as a record in case I passed on so we would have some record and some signature acknowledging the obligation."; that he continued to sell Brooks feed for a short time after he received the letter from General Mills dated May 16, 1957; that he (Livingston) was a representative dealer for Rockford-Purina Feed Company and that his company followed the policy of setting a credit limit on any loan extended to a customer; that he was familiar with the custom of General Mills of placing a credit limit on any loan extended to a customer; that he made no inquiry about Brooks' credit limit with General Mills.

Livingston had known C. H. Brooks of San Angelo, Texas, since 1938 or 1940 and had business dealings with him during 1954, 1955 and 1956, when he was a district salesman for General Mills. Brooks resigned from General Mills on January 1, 1957. While doing business with Brooks, Livingston became acquainted with General Mills' turkey finance program. When asked "—as to what Mr. Brooks told you with respect to the method of operation of this turkey finance program of General

Mills Incorporated?" he answered "He gave me this information, whenever they had a customer that was approved by their credit department if I, in the case that I provided grain to that customer, the customer would sign a finance form, and I could complete or accomplish that in giving our signature, and send it in to their main office, or their Kansas City office in that instance, and they would mail us a check on it." For several years Livingston sold grain to customers in Coleman County under General Mills' turkey finance program. There was nothing unusual about Brooks' turkey finance program with General Mills, except that Brooks was being financed 100%, whereas, under the usual program, General Mills financed only "two out of three".

C. H. Brooks testified that for about four years while he was employed by General Mills as a district feed salesman, he was also raising turkeys on his own account; that in the fall of 1956 he applied for credit with General Mills to finance him in raising 50,000 turkeys that he had contracted to Fort Worth Poultry & Egg Company; that he contacted Livingston about the grain for this project about the time he started "putting the birds down" and asked him if he could supply the grain. Brooks was asked "—Did you talk financing arrangements with him?" and he answered "I told him it would be under the usual turkey finance."; that he purchased the grain from the plaintiffs on a thirty day basis; that the grain was sold to him and he was supposed to pay for it within thirty days; that after he had been purchasing grain from the plaintiffs for some time, he was advised by General Mills that he had exceeded his credit limit and would not be extended further credit; that by April, 1957, he had exceeded his credit limit, which he said was between $135,000 and $145,000; that when he used the words "finance arrangement" he meant "the advance of money to—in this instance to the grain dealer. Actually, they have financed the grain to me."; that it was an obliga-

tion that he had to repay; that he executed a blanket note to General Mills which was secured by a chattel mortgage on his fowls.

 The dominant purpose of our venue statute is to give the defendant the right to defend a suit in the county of his residence. Exceptions to this general rule must be strictly construed and clearly established before a defendant can be deprived of the right to be sued in the county of his residence. Goodrich v. Superior Oil Company, 150 Tex. 159, 237 S.W.2d 969. Under that portion of exception 27 of Article 1995 relied upon by the appellees, they had the burden of proving by a preponderance of the evidence three venue facts, namely, (1) that the appellant was a foreign corporation, (2) that they had a cause of action against the appellants and (3) that the cause of action or a part thereof arose in Coleman County.

The appellees say they do not contend that when Brooks first went to Livingston and talked to him about supplying the grain that Brooks "then had the authority he presumed to exercise". They say General Mills is liable to them by reason of ratification and estoppel.

We find no evidence that Brooks professed to act as the agent for General Mills when he entered into the contract with appellees to purchase the grain. Before the doctrine of ratification or estoppel could be applied to establish liability against General Mills, appellees would have the burden of first establishing a contract made by Brooks for and on behalf of General Mills. In the case of Great Southern Life Insurance Co. v. Dolan, Tex. Com.App., 262 S.W. 475, 477, the court held: "A principal may ratify the unauthorized contract of its agent, but there must be a contract before there can be ratification. The principal may be estopped to deny the validity or binding effect of an unauthorized contract by its agent, but there must have been such contract made before the estoppel can be invoked."

Because the evidence failed to show a cause of action against General Mills, the judgment must be reversed and the cause remanded.

Reversed and remanded.