Ruby A. MOBLEY, Individually and as Administratrix of the Estate of Bernard A. Mobley, Deceased, Appellant,

v.

MOBIL OIL COMPANY, SUBSIDIARY OR DIVISION OF SOCONY–MOBIL OIL COMPANY, and Jim Bulls, Appellees.

No. 6980.

Court of Civil Appeals of Texas.

Beaumont.

Sept. 5, 1968.

Rehearing Denied Oct. 2, 1968.

Joe H. Tonahill, Jasper, J. Paul Pomeroy, Jr., Houston, for appellant.

Weller, Wheelus & Green, Beaumont, for appellees.

PARKER, Justice.

This is a plea of privilege case. Ruby A. Mobley, individually and as administratrix of the Estate of Bernard A. Mobley, deceased, as plaintiff, sought recovery for damages to her building and its contents which were destroyed by fire alleged by plaintiff to have been caused by the negligent acts of Mobil Oil Company and Jim Bulls, defendants. Suit was filed in Jefferson County, Texas. Defendant, Mobil Oil Company, filed a plea of privilege to be sued in Dallas County, Texas. In a hearing before the court without a jury, the trial court sustained its plea of privilege. The defendant, Jim Bulls, is a resident of Jefferson County, Texas. The parties will be referred to as they appear as plaintiff and defendants in the trial court.

No findings of fact were requested or made by the trial court. The court found that plaintiff's controverting plea to the plea of privilege was "not well taken and should be overruled." The trial court having sustained defendants' plea of privilege, in the absence of findings of fact, it is presumed that all fact issues which pleadings and the evidence will support were resolved in favor of the judgment rendered. In reviewing the evidence, we will disregard all adverse evidence and give credit to all evidence that is favorable to defendants, whose plea of privilege was sustained. Banks v. Collins, 152 Tex. 265, 257 S.W.2d 97. Plaintiff has raised only contentions that there is "no evidence" to support the judgment. Alice Medical and Surgical Clinic v. Barker, Tex.Civ.App., 350

S.W.2d 587; James v. Drye, 159 Tex. 321, 320 S.W.2d 319. As stated in Goodrich v. Superior Oil Co., 150 Tex. 159, 237 S.W.2d 969 (1951):

> The general rule of venue is, of course, that a defendant shall be sued in his own county, and however many and important are the exceptions contained in the statute, an equal doubt between the exception and the rule is to be resolved in favor of the rule. Stated differently, the application of the exception must clearly appear.

Also see Compton v. Elliott, 126 Tex. 232, 88 S.W.2d 91, 93 (Tex.Com. of App.1935, opinion adopted by Supreme Court).

Plaintiff's points of error are:

### POINT 1

The District Court erred in sustaining the plea of privilege of Mobil Oil Company because the undisputed evidence establishes venue under Subdivision 4, Article 1995, Vernon's Ann.Civ.St. in Jefferson County, Texas, the county where suit was filed.

### POINT 2

The District Court erred in sustaining the plea of privilege of Mobil Oil Company because the undisputed evidence establishes venue under Subdivision 27, Article 1995, Vernon's Ann.Civ.St. in Jefferson County, Texas, the county where suit was filed.

Jim Bulls is a resident of Jefferson County, Texas. Mobil Oil Corporation, Inc. is a foreign corporation with its principal place of business in Dallas, Dallas County, Texas. Plaintiff alleged that she and her deceased husband were the owners of a two-story, shingle-roof building constructed of heavy cypress and concrete, commonly known as the "Old Coast Guard Station" at Sabine, Jefferson County, Texas. She further alleged that on February 14, 1964, this property and its contents were destroyed by fire as the result of negligent acts of the defendants, Mobil and Bulls.

On February 1, 1964, B. A. Mobley, plaintiff's deceased husband, requested Bulls to furnish diesel fuel to Chevron Oil Company, lessee of Mobley's docks. These docks were on the Gulf of Mexico. North of the Gulf was a concrete apron sloping toward the water approximately one and one-half inches to the foot. To furnish diesel fuel, Bulls delivered a skid tank to this place, placing it between the water and the two-story building of the Mobleys, some six or seven feet south of the building, on the concrete apron. To unload diesel fuel from this tank to boats or ships, a pump was attached to the skid tank with power from an electric motor. Electricity furnishing energy to the motor was obtained through a long cord, connection being made on February 1, 1964 by plugging in the cord to an outlet on the second story of Mobley's building and never touched thereafter. This electrical connection was made by Mobley or his brother-in-law, Atkinson. The electrical cord and wiring were insulated and in good shape. Probably, Bulls plugged into the electrical outlet on the upstairs porch.

Bulls testified: Skid tanks owned by Mobil Oil Company were consigned by Mobil to customers to hold diesel fuel or gasoline. One was consigned to Jim Bulls. He, in turn, did deliver the tanks on loan or consignment to customers. The skid tank was delivered to the Mobley property at the request of Bill Mobley, deceased. It was not leaking when delivered. The tank was not leaking after the fuel was first placed in it at the Mobley place. The tank was first filled with diesel fuel on February 1, 1964, and the second time about a week later on February 10 or 11. The fire occurred on the 14th of February when no one was on the premises and no one was filling a tank. Bulls observed a drop or two of diesel fuel leaking from the cut-off valve which was located between the tank and pump. The valve dripped only when open. When the valve was turned off, it did not drip. Bulls

told Mobley to turn the valve off when the pump was not in use until they could get it fixed.

Regarding the existence of diesel fuel under the pump, Bulls testified that he never saw a "puddle" of diesel fuel beneath the valve on the skid tank, but did see a diesel stain under the valve about a foot in diameter. Bulls also testified that the skid tank was not burned in the fire, although it remained in the same position during a good portion of the early part of the fire.

Photographs of the tank show no evidence of fire. The tank was opposite boards on the building which appear not to have been burned on the outside.

Mrs. Mobley testified: Mrs. Ruby Mobley and Bill Mobley had left the Mobley premises about 2:30 or 3:00 p. m. on the afternoon of the fire. Mrs. Mobley testified that the skid tank and pump were placed on the concrete apron and walkway five or six feet from the house proper. She admitted that the concrete upon which the tank was sitting sloped or slanted toward the water, not toward the house. The cord was plugged in on the north side of the building and the plug was still in the socket after the fire. The fire did not start around the plug. It had been in place approximately two weeks before the fire, and she never, at any time, saw any sparks or anything wrong with the wiring. The fire started approximately one hour after the Mobleys left the place. She testified that everything was in good order when she left, and she did not see any sparks or short in the wire.

The Weather Bureau report for February 14, 1964 reflects that at 2:00 the wind was directly out of the east, at 3:00 the wind was out of the east-southeast.

Boudreaux, a witness, was working a mile away and saw black smoke. A fire was burning on the south side of the building at the bottom of the wooden wall, but the bottom was already burned out when he got there. The store room was already burned when he arrived. He did not see a fire burning on or under the skid tank. He did not see diesel fuel on the concrete slab between the tank and the house, or fire burning on the concrete, or any diesel fuel on the house.

Professor Edwin Eads, a professor of chemical engineering at Lamar Tech, a witness for plaintiff, testified: That diesel fuel has a lower boiling point than kerosene, but would burn. Diesel fuel is not as easily ignited as gasoline or kerosene. A match thrown into diesel fuel would not cause it to flame. A constant spark is required to ignite diesel vapor. The electric cord itself lying in the diesel fuel would not ignite it. In order for an electric cord to ignite diesel fuel, the insulation would have to be broken with the current side peeled back and a short. This would make two electrodes and this was the necessary requirement for the ignition of diesel fuel. Vapor must be released from a puddle of diesel fuel, otherwise it acts like a puddle of water. If the wire was crushed or someone stepped on the wires and mashed them together within the insulation, this would not cause a spark or sparking unless the insulation was broken and you had two naked wires. Again, the witness testified:

Q. Now, if you had two wires, naked wires laying through the diesel and —in the diesel fuel and they were not touching, then you would have no arking [sic], but if the wires touched, then you would?

A. That's true.

Again, the witness testified:

Q. How about the scraping of the wires when the wind blows and hits the wires that is [sic] laying on the concrete and the wind blowing and wearing the insulation off.

A. Yes, it would do that, but, upon examination of that wire, that's an awfully tough wire. It would still require some sort of an abrasion, some sort of scarring or impact, because that's good wire.

He examined this wire and found it to be insulated and in good condition. On cross-examination, he testified:

Q. Now Doctor, if I understood you correctly, you couldn't have a spontaneous combustion as far as diesel fuel is concerned, out on cement, could you?

A. No, sir.

Q. Now assume that this—that the diesel fuel was under a tank, that a leak was in a valve here and it was under that tank, and, if it was going to catch fire, this tank was sitting right there, wouldn't you have some evidence of burning on the tank if the diesel fuel was under it?

\* \* \* \* \* \*

Q. —That if you have no evidence of any burning on the tank whatever—

A. There should be some evidence of it.

\* \* \* \* \* \*

Q. And there is not any evidence on that tank of the tank burning, is there?

A. Not apparently, no. (Witness was looking at Exhibits D–1 and D–2.).

Again:

Q. All right, if you had a fire on this walk, that piece of wood isn't burned on this side, is it?

A. It doesn't appear to be, no.

Q. And if that was the same side as this was, it was an outside wall, wasn't it?

A. It was.

Q. Now, if the fire started on this outside wall, this is a cement beam, that would have been discolored, wouldn't it?

A. Yes, sir.

Q. Sir?

A. Yes.

Q. You don't see any discoloration whatever on that wall, do you?

A. That's right.

Q. And you don't see any down here at this end, do you?

A. No, sir.

Q. And you don't see any up here at the top, do you?

A. No, sir.

Q. So if the fire had burned from the outside up, you would clearly have burn marks on the top of that wall, wouldn't you?

A. Right.

Q. But you don't see any?

A. That's right.

Q. So the fire—that fire didn't start outside, did it?

A. No, it started inside.

The foregoing questions were with reference to defendants' Exhibit No. D–3.

The witness also testified that the cement apron on which the skid tank was located had a distinct slope towards the water of about one and one-half inches every two feet.

Again, the witness testified:

Q. Based on those photographs and what you saw there, this fire started inside in your opinion?

A. I do think so, yes, sir.

■ It is clear that no one knows how the fire started. From circumstances, the conclusions are logical it did not start from the skid tank, from diesel fuel or from a defective electrical cord, but originated inside the building. Plaintiff proved no negligent act or omission on the part of either of the defendants proximately causing the fire. Appellant's first point of error is overruled.

■ By sustaining the plea of privilege of Mobil, the trial court found there was no agent of Mobil Oil Company in Jefferson County. Although the skid tank was owned

by Mobil and by it consigned to Jim Bulls, he, acting alone, loaned the tank to Mobley. This arrangement between Mobley and Bulls was in no manner controlled by Mobil. We find no evidence that Bulls acted as agent for Mobil when he entered into and fulfilled the contract with Mobley. He was an independent contractor, not engaged by Mobil "to perform a contractual relationship with discretion" binding on Mobil and the third party, Mobley. Jim Bulls sold Mobil products on a commission basis. Plaintiff did not prove a cause of action against the resident defendant, Jim Bulls, or Mobil Oil Company, or that Mobil Oil Company had an agent or representative in Jefferson County as contemplated by Article 1995, Section 27, V.A.C.S. Sugarland Industries, Inc. v. Falco, 348 S.W.2d 102 (Tex.Civ.App.1961); General Mills, Inc. v. Livingston, 333 S.W.2d 215 (Tex.Civ.App. 1960), and authorities cited in each.

Plaintiff's second point of error is overruled.

Affirmed.